**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**5:09-CR-216-FL-8**

UNITED STATES OF AMERICA

    **v.**

ZIYAD YAGHI,

<u>**DEFENDANT ZIYAD YAGHI'S SENTENCING MEMORANDUM**</u>

    COMES NOW the Defendant, Ziyad Yaghi (hereinafter referred to as "Yaghi"), by and through counsel and submits this Sentencing Memorandum.

<u>**STATEMENT OF FACTS**</u>

    Yaghi was charged, in the Second Superseding Indictment, with conspiracy to provide material support to terrorists in violation of 18 U.S.C. § 2339A (Count One) and conspiracy to murder, kidnap, maim and injure persons outside of the United States, in violation of 18 U.S.C. § 956(a) (Count Two). The ONLY alleged overt acts in furtherance of the conspiracy by Yaghi for BOTH counts were:

> On or about October 7, 2006, defendant Ziyad Yaghi departed the U.S. for Jordan, to engage in violent jihad.

> On or about April 3, 2007, tickets were purchased for defendants Ziyad Yaghi and Mohammad Omar Aly Hassan, to travel from the United States to Israel. On June 13, 2007, defendants Ziyad Yaghi and Mohammad Omar Aly Hassan departed Raleigh for Tel Aviv, Israel. Having failed in their attempt to engage in violent jihad, Ziyad Yaghi returned to the United States on July 16, 2007 and Mohammad Omar Aly Hassan returned to the United State on July 21, 2007."

Yaghi was denied pretrial release and has been in custody since being arrested on July 28, 2009. At his arraignment on August 15, 2011, Yaghi pled not guilty to the charges against him contained in the Second Superseding Indictment.

On October 12, 2011, Yaghi was found guilty of Count One (conspiracy to provide material support to terrorism with the underlying purpose being to carry out violations of Title 18 Section 956 (conspiracy to murder kidnap, maim and injure persons) and guilty of Count Two (Conspiracy to murder, kidnap, maim or injure persons).

## Summary of Evidence from 2006 Trip

The evidence introduced with regard to the 2006 trip to Jordan was primarily proffered by Daniel Boyd. He indicated that Yaghi had met with him and was impressed with his purported Afghanistan exploits. The community generally held Daniel Boyd out as some kind of military hero? The youngsters at the IAR were attracted to his "persona" and exploits. He and Yaghi discussed Islam and their religious duties. Yaghi was seeking guidance with regard to his responsibilities and duties.

Yaghi did leave for Jordan. His employer, Majed Musa testified with regard to Yaghi's desire to get married and confirmed that Yaghi would stay with his family. While in Jordan Yaghi did have contact with Daniel Boyd with regard to the identity of a mosque and location. Yaghi did seek out a bride and resided with his family while in Jordan. A copy of the deposition of the bride's father, Nebil Hussein Sayed Al-Shyal, is attached hereto and incorporated herein by reference as Exhibit "A," confirming the attempt at marriage and familial relationships. Yaghi returned thereafter to the States. The record is void of any contact with a terrorist, terrorist organization, engagement with any military or contact with explosives or firearms while in Jordan.

2

## Summary of Evidence from 2007 Trip

As set forth in more detail below, Daniel Boyd, Zak Boyd and Dylan Boyd acknowledged there was no agreement with Yaghi or anyone else before the summer of 2007 overseas trip to commit specific acts of "violent jihad" as alleged in the Indictment. The relationship between Yaghi and the Boyd family was severed after the 2007 trip. Daniel Boyd acknowledged he did not communicate or have any dealings with Yaghi after the summer of 2007 overseas trip. Daniel Boyd defined only one specific exchange between Yaghi and Boyd. This exchange took place at Boyd's Blackstone Market after the 2007 trip. It was described as "benign". The exchange was not warm and friendly, but was standoffish.

Daniel Boyd had no other material contact with Yaghi during or after the summer of 2007 trip until he visited the Yaghi while in jail in 2009. At no time did the Yaghi seek out Boyd. Yaghi did not invite Daniel Boyd to jail and committed no criminal offense during the recorded jailhouse conversation.

Daniel Boyd and the three informants used by the FBI testified that there was no relationship between Yaghi and co-defendants Sherifi or Subasic. The three FBI informants, Abdullah Eddarkoui, "Jawbreaker", Melvin Weeks, "Hammerhead", and Alvis Harris, "Crosstown", all testified that they had never conspired, communicated or recorded any conversation with Yaghi.

Zak Boyd and Dylan Boyd confirmed that there was no agreement with Yaghi as to any of the allegations in Counts One and Two. Zak Boyd and Dylan Boyd confirmed that they were not personally involved with Yaghi as to the allegations in Counts One and Two. They had no direct knowledge of any such agreement by their father Daniel Boyd with Yaghi. The record is void of any witness testifying that Yaghi entered into a conspiracy to provide material support to

a particular terrorist group or organization or to any of the alleged co-conspirators. No witness testified that Yaghi knowingly, willfully and unlawfully conspired to commit an illegal act against a U.S. citizen or any other person.

There were no audio or video recordings of Yaghi at Boyd's Blackstone Market. There were no audio or video recordings of Yaghi at the Caswell County "training". There was no audio or video of Yaghi at the Boyd residence. There was no audio or video of Yaghi with Jawbreaker, Crosstown, or Hammerhead, the three informants. These informants were, for all practical purposes, with Daniel Boyd daily for years. The lack of appearance on any recordings, many hundreds of hours, of Yaghi confirms a departure from the company of Daniel Boyd. More importantly, this departure occurred before Daniel Boyd accumulated his arsenal and began his 'training" in Caswell County.

The record developed by the government, in discovery and at trial, confirms that Daniel Boyd's Saifullah personality, and departure from reality, acutely materialized after the 2007 trip. This unfortunate departure appeared to be driven by the loss of his son. This materialization, or radicalization, transpired in the complete absence of Yaghi.

Yaghi was never prohibited from traveling to Israel or Jordan by the authorities. Each trip was without incident. Each trip is void of any contact with a terrorist, terrorist organization, engagement with any military or contact with explosives or firearms while traveling.

## Summary of Witnesses

Agent Minella presented a significant arsenal of weapons belonging to Daniel Boyd. The arsenal was seized primarily from the Boyd home. No evidence was introduced establishing that Yaghi had any knowledge, observation, contact, participation or training with the Boyd weapons. Actually, there was no evidence introduced at trial that Yaghi purchased a firearm. The Second

Amendment still remains in effect and the purchase, possession and use of a firearm remains legal.

## Abdullah Eddarkoui "Jaw Breaker"

Eddarkoui testified that his relationship with Daniel Boyd was between November 2005 and July 2009. Eddarkoui did not testify that he had any dealings with Yaghi. Eddarkoui stated that there were no audio or video recordings between Eddarkoui and Yaghi. He did acknowledge that he saw Daniel Boyd on a daily basis and recorded their conversations. Yaghi was not present during any conversations with Eddarkoui and Daniel Boyd. Eddarkoui confirmed that Yaghi was not present at Caswell County for the "training sessions."

## Melvin Weeks

Melvin Weeks testified that he had never conducted any recordings or surveillance of Yaghi.

## Alvis Harris

Alvis Harris testified that he became involved with the FBI investigation of Daniel Boyd on May 17, 2007. Harris testified about the "small circle" of individuals that would gather with Boyd at his store. Yaghi was not identified as a part of this group. Harris also testified about going shooting with Boyd in Caswell County and confirmed that Yaghi was not present.

## Daniel Boyd

Daniel Boyd testified that he first met Yaghi in 2006, that they discussed their faith and religious ideology. He acknowledged that he told Yaghi which mosque to visit in Jordan. Yaghi, Hassan, and Boyd shared quotes from contemporary scholars and had discussions about jihad and obligations. Daniel Boyd testified that he viewed jihad as obligatory. He now acknowledges that this is a corrupted view of the meaning of jihad. Yaghi, Hassan, and Boyd

5

had tea and Boyd bolstered them with "pep" talks. One would expect that such conversations would constitute the practice of free speech, religion and association.

Daniel Boyd testified that in early 2007, he told Yaghi that he would be traveling overseas with his sons. Yaghi asked Boyd if he could come. Boyd told him he could travel to Israel, but that he could not travel with the Boyd family. Boyd told Yaghi he would have to find his own place to stay and he could stay with whomever he wanted and could bring anyone he wanted.

Yaghi and Hassan paid for their tickets with their own money. They met Boyd and gave him the money for the tickets. They went to Boyd's bank where he obtained a bank check. Boyd wired Yaghi and Hassan's money to the travel agency that he used for his own tickets. Boyd called and ordered Yaghi and Hassan's tickets.

Daniel Boyd testified that there were no discussions at that time about the purpose of the trip being to commit any form of terrorism as alleged in the Indictment. The record is void of any proof of the allegation regarding terrorism or planning save pure speculation.

In or about May 2007, Daniel Boyd ran into Yaghi and Hassan at the mosque in Durham, NC. Yaghi and Hassan told Boyd that they had some questions about their upcoming trip. Boyd rode with Yaghi and Hassan to Cary. Hassan was driving; Boyd was in the passenger seat; and Yaghi was in the backseat. Yaghi and Hassan asked Boyd about how to get around and what the rules were in Israel. Boyd explained that he personally traveled light because it was cheaper and that he always found a cab driver that had a permit so that he could drive in Israel and Palestine. Daniel Boyd told Yaghi and Hassan that he would line up a cab driver with a permit to drive in Israel and Palestine for them once they arrived at the airport. Otherwise, Yaghi and Hassan

6

would go their separate ways. Yaghi and Hassan told Boyd that they were going overseas to get married. Boyd thought they were joking.

Towards the end of this discussion, Yaghi said "let's show him" and opened the center console and revealed the butt of a rifle. Yaghi told Boyd that they (Yaghi and Hassan) use it for training and for target practice. Daniel Boyd testified that he understood training in a loose general way to mean bettering oneself. Yaghi and Hassan did not specifically say that they were training to prepare for jihad or for the upcoming trip. Boyd speculated that the statement could include training for the trip. It is worth noting that speculation and guessing is generally incompetent evidence. Boyd confirmed the gun was a .22 rifle, which was later described as a "pea shooter".

## Daniel Boyd testimony related to June 2007 trip overseas

In June 2007, Zak and Daniel Boyd departed for Israel. Two days later Omar Yaghi and Hassan departed for Israel. Boyd testified that he did not tell Yaghi what to wear and that he did not give them instructions. When Daniel and Zak Boyd arrived in Tel Aviv they were detained for 15 hours and denied entry. The Boyds flew from Tel Aviv to France. Daniel Boyd did not see Yaghi while in Paris.

After spending a couple of days in Paris, Daniel and Zak Boyd flew to Amman, Jordan. They traveled to various cities including Salt, where they stayed for approximately three weeks. Daniel Boyd did not see Yaghi while in Jordan.

When Boyd was asked about an email sent to him by Yaghi on June 15, 2007, Boyd testified that he never actually saw the email while he was in Jordan. He knew about the email only because he saw it in discovery. Similarly, when asked about an email sent to him by Hassan on June 17, 2007, Boyd said that he never received the email while he was in Jordan.

Again, he knew of the e-mail only because he saw it in discovery. Daniel Boyd never saw or had

any communication with Yaghi during the entire time he was overseas in 2007.

### Daniel Boyd testimony related to events after June 2007 trip overseas

After the trip in 2007, Daniel Boyd had no contact with Yaghi save one or two benign

occasions. Yaghi came to Daniel Boyd's store, Blackstone Market, shortly after it opened in

October 2007. Daniel Boyd testified that pleasantries were exchanged but it was not warm or

friendly. Boyd said that Yaghi did not stay long and was acting rather standoffish.

Daniel Boyd also testified that, by the time he was interviewed by the FBI in August

2007, Yaghi had certainly split from him.

### Daniel Boyd other testimony

Daniel Boyd stated that he was testifying in this trial as part of his plea agreement in

which the Government agreed to dismiss eight counts against him. Daniel Boyd acknowledged

that he has an incentive to testify against the defendants in this trial because his cooperation

could lead to receiving a lower sentence.

In regard to the June 2007 overseas trip, Daniel Boyd testified that his reason for trip was

to reward his sons and take them to learn more and to visit the holy sites. According to Daniel

Boyd, there are many holy sites such as the Dome of the Rock and historic mosques in

Israel/Palestine that have nothing to do with violent jihad, and Muslims who pray at these holy

sites receive more of an reward in the afterlife. Boyd said that the purpose for the trip had

nothing to do with Yaghi or terrorism.

Daniel Boyd testified that there was no plan to murder, maim, kidnap or otherwise injure

anyone overseas. Boyd also testified that there was no plan to provide weapons or material

support to terrorists. Boyd stated that he never suggested how to find a way to kill or to kill

Americans overseas. Yaghi never told Daniel Boyd that he intended to murder, maim, kidnap, or injure anyone overseas or that he intended to provide material support to terrorists. Boyd acknowledged on cross examination that there was no agreement with Yaghi to do anything in furtherance of any of the alleged "purposes" of the conspiracy and no agreement as to the "manner and means" as set forth in the first two counts of the Second Superceding Indictment.

Boyd went on to testify that he never discussed a purpose for the trip with Yaghi and never discussed jihad specifically in relation to the trip with Yaghi. Boyd testified that there was no specific plan of action related to violent jihad with regards to the 2007 trip.

There was no specific reason for the way that the travel arrangements for the trip were made. He confirmed that he did not even know where Yaghi and Hassan were planning on staying once they arrived in Israel. Boyd further testified that Yaghi never told him any plans that he had to commit violent jihad. There was never any discussion between Boyd, Yaghi and Hassan about meeting terrorists or blowing things up or doing anything illegal. Boyd testified that he had read reports of Yaghi's interviews with customs agents and that he was truthful. Daniel Boyd stated that he never had any secret conversations with Yaghi.

Daniel Boyd went on to testify that he never stated to anyone, including his sons, Zak and Dylan Boyd that he assisted Yaghi in traveling overseas to commit violent jihad. Boyd also testified that Yaghi was not present when he took others shooting in Caswell County.

Boyd testified about the effect that the loss of his son in April 2007. Regarding the period in time after losing his son, Luqman, Boyd testified, "I'm in a bad way, we lost a little cub, my son." Boyd testified that after his son's death he further developed his persona, Saifullah, to distract him from the pain he felt. Boyd was known throughout the community for having been a mujahedeen fighter against the Russians in Afghanistan and built upon his

Saifullah persona by playing up this image. Boyd confirmed his Saifullah persona was an evolving sickness and as time passed his sickness worsened.

Boyd stated that as his Saifullah persona grew, his ideas evolved from very general ideas in 2007 to more specific ideas in 2008-2009, well after Yaghi had left his company. Boyd went on to say that he wasn't putting ideas on the table in 2007 and that his conversations with Yaghi were very different from his conversations with Anes Subasic and others following the 2007 trip.

### Jamar Carter

Jamar Carter testified that he worked with Hassan at UPS. Carter stated that Hassan introduced him to Islam with "very general information" (not radical) including books, DVD, translations of the Quran (100% anti-terrorist). Carter stated that he was trying to find his moral compass. Carter also testified that Saleh Hamdan promoted the argument that suicide bombers were permissible. Hamdan was the leader of the discussion and was the "vocal" one. Carter went on to say that he took issue with the Islamic Association of Raleigh (IAR) because there was not "a concern for learning basics and fundamentals."

Carter acknowledged having listened to an Anwar Al Awlaki speech and stated that Anwar Al Awlaki was English speaking and articulate. He knew Al Awlaki literature was once mainstream and sold in bookstores and available for download on the internet. Carter also testified that jihad can mean— crusade for belief and personal struggle. Carter further stated that it was perfectly ok to defend your family and your land.

### Humza Ismail

Humza Ismail stated that Saleh Hamdan initiated most of the conversations regarding "ideological differences". Humza said that he went paintballing.

Humza acknowledged that the face book conversations on the topic of suicide bombing were about "general knowledge" on the topic. Humza admitted to posting a picture of a soldier, with an AK-47, with the statement, "Support our Troops," but testified that he was not promoting violent jihad and just thought that the picture was "cool." Humza testified that many people listened to Anwar Al-Awlaki's lectures and that over time Al-Awlaki's lectures changed.

### Brandon Elmore

Brandon Elmore testified that he was searching for his moral compass when he met the Boyds. Elmore testified that when he was having conversations with Daniel Boyd that he agreed with a lot of the things that Boyd said. Elmore also testified that jihad has many different meanings and does not simply mean, "war." Elmore stated that that he also played violent video games, paintball, went shooting, and that none of those activities were for training to commit violent acts.

### FBI Agent Mike Greer

Agent Greer testified that approximately 22 computers were seized during the investigation.

### FBI Agent Bill Logallo

Agent Logallo testified that there were no emails between Yaghi and Subasic.

### FBI Agent Powell

Agent Powell testified about the content of Facebook pages. The content of Facebook pages, from approximately 2006 until 2007, contained some statements and videos postings that were related to jihad and mujahedeen fighters.

Agent Powell also acknowledged that several of the inflammatory statements or postings made were in the forms of "raps" or musical lyrics.

Although the material was inflammatory, the postings were void of terrorism, planning of terroristic acts, solicitation of funds, selection of targets or accumulation of resources and materials. The material was consistent with speech, association and political ideations.

## Zak Boyd:

Zak Boyd testified, under oath, that he never conspired with Yaghi to murder, kidnap, maim or injure United States citizens or any other persons prior to the 2007 overseas trip or at any other time. Zak Boyd testified he did not conspire with Yaghi to provide material support to terrorists in the form of providing "currency, training, transportation and personnel, and to conceal and disguise the nature, location, source, and ownership of material support and resources". Zak Boyd stated that he did not even know Yaghi was going overseas in 2007 prior to the trip. He never saw Yaghi overseas in 2007. The Boyds' family plan for the trip in the summer of 2007 was to go see holy sites. Zak Boyd testified that there was no planning or preparation prior to the summer of 2007 trip for violent jihad.

Zak Boyd testified that Yaghi attended a campout at the Boyd home. Zak Boyd stated that at the campout, the young men in attendance fished, wrestled, ate by the fire and camped out. Zak Boyd stated that Daniel Boyd was not in attendance the entire time and only spoke about his experiences in Afghanistan. Zak Boyd stated that there was no specific agreement reached by his father and Yaghi during the camping trip and that his father's discussions of jihad evolved over time.

Zak Boyd acknowledged and described how his father's Islamic ideology was much different and much more extreme in 2008 as opposed to 2007.

Zak Boyd testified that his father had multiple phases related to his discussions with individuals. Zak Boyd testified these phases took time before an individual would be allowed

into Daniel Boyd's "inner circle."  In the first phase, Daniel Boyd would get to know the individual.  Daniel Boyd would gauge the individual by asking them more pinpointed questions. In this phase, Daniel Boyd would determine one's extremeness.  In the second phase, Zak Boyd described that Daniel Boyd would attempt to grow closer to the individual, such as inviting them over to this house.  Zak testified that Daniel Boyd may provide the individual with information. The third phase, according to Zak, would include discussions that jihad is part of Islam and how to apply such beliefs in this day and age.  Lastly, Zak stated that Daniel Boyd would begin discussing different options for jihad.  Again, Zak stated that such a process would take time. Alvin Harris said it took him six months to break in to Daniel Boyd's "inner circle" enough to engage in meaningful plans to wage "violent jihad."

The evidence clearly reflected that Daniel Boyd targeted young boys for indoctrination into his inner circle.

### Dylan Boyd:

Dylan Boyd testified about one conversation between himself, Daniel Boyd, Yaghi and Hassan.  Dylan stated that the conversation discussed questions from Yaghi and Hassan about the Islamic faith and discussed views in general.  Dylan testified that his Father's original discussions about jihad related to personal struggles and defensive mechanisms, such as protecting Muslim women and assisting Muslims being oppressed by others.  Dylan testified that Yaghi and Hassan were trying to understand the truth.

Dylan Boyd stated that the Muslim community was making certain suggestions to Yaghi and Hassan.  Yaghi and Hassan both seemed confused about the community's position.  Since Daniel Boyd had experience on the front line in Afghanistan, Dylan said Yaghi and Hassan sought guidance from Daniel Boyd.

Dylan Boyd testified he did not originally plan to go overseas in 2007 and had no participation in planning the trip. Dylan testified he arrived on the last 10 days of his father's and Zak's trip. He did not see Yaghi while overseas in the summer of 2007. Dylan testified that the purpose of the 2007 trip was to become familiar with the holy land and to tour the holy sites. Dylan said the trip was to view Jordan and to look at the land.

Dylan testified that he had no agreement with Yaghi to take a trip overseas to kill people. Dylan testified that he had no agreement with Yaghi to provide material support to terrorists. Dylan also testified he did not have an agreement with his brother Zak or his father Daniel to provide material support to terrorists or kidnap, maim, murder or otherwise injury persons.

### Hysen Sherifi

Hysen Sherifi was the only co-defendant to testify in his own defense at the trial. Hysen Sherifi confirmed that he did not conspire with Yaghi as to either count. Additionally, he provided no testimony or other evidence connecting Yaghi to the conspiracy.

### ARGUMENT

On January 12, 2005, the U.S. Supreme Court held that the Sixth Amendment right of jury trial applied to the U.S. Sentencing Guidelines because district courts were required to apply the Guidelines and required to increase guideline ranges based upon findings of aggravating facts. The Court obviated the Sixth Amendment requirement by finding that the Guidelines are simply advisory. Accordingly, district courts now are to continue with fact-finding, but are mandated to treat the advisory guideline range as only one of a number of factors to be considered in determining a proper sentence pursuant to 18 U.S.C. § 3553(a).

In determining that statutory sentence, courts are bound by the mandate and overarching principle expressed in Section 3553(a): that they impose sentences that are sufficient but not

greater than necessary, to comply with the purposes of sentencing expressed in the statute. These purposes are retribution, deterrence, incapacitation, and rehabilitation.

The factors that the court must consider in determining a sentencing are facts relating to the offense and the defendant; the kinds of sentences available; the Sentencing Guidelines Manual, including the (now non-mandatory) guideline range; the need to avoid unwarranted sentencing disparity; and the need to provide restitution where applicable. Whereas neither Section 3553, nor *Booker*, suggests that any one of these factors is to be given greater weight than any other factor, it is clear that all of these factors are subservient to Section 3553(a)'s mandate to impose a sentence not greater than necessary to comply with the four purposes of sentencing. Further, although courts differ with regard to how much weight to give to the advisory guideline range (i.e., whether to give it weight equal to or greater than the other factors), the better reasoned approach is to treat it equally.

In order for a sentence imposed under Section 3553 to be reasonable, a district court must begin within a correct determination of the guideline range. Yaghi has lodged several objections to the initial Presentence Report which will be discussed shortly.

After determining the final advisory guideline range, this Court must then determine what sentence is appropriate under Section 3553. Yaghi first argues that this Court should not consider any aggravating factors beyond those that are already reflected in the advisory range. The Sentencing Guidelines account specifically for many aggravating factors. There are significantly more increases than decreases in offense level as this case so well illustrates. In contrast, the Court is not limited in what mitigating factors it may consider. In light of the factors expressed in Section 3553, Yaghi argues that he be sentenced to a sentence below the advisory guideline range. A guideline sentence in this case is a death sentence. To argue

otherwise would require us to engage in the same legal fiction which resulted in the reversal of Harp. Legal fiction and speculation have no place in a criminal proceeding.

Accordingly, district courts must now impose a sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553 (a)(2), after considering:

> (1)    the nature and circumstances of the offence and the history and characteristics of the defendant;
>
> (2)    the kinds of sentences available;
>
> (3)    the guidelines and policy statements issued by the Sentencing Commission, including the (now non-mandatory) guideline range;
>
> (4)    the need to avoid unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct; and
>
> (5)    the need to provide restitution to any victim of the offense.

18 U.S.C. § 3553(a)(1),(3)-(7).

Section 3553(a) has been described in *Booker,* and much post-*Booker* case law, as containing various "factors". One of these "factors" remains the Sentencing Guidelines. Accordingly, the guideline range must still be considered in determining a sentence. This is a potentially misleading oversimplification. Section 3553(a) is actually comprised of two distinct parts. The "sentencing mandate" contained in the prefatory clause of Section 3553(a) and the "factors" to be considered in fulfilling that mandate. The sentencing mandate is the *overriding principle* which limits the sentence a court may impose.

The basic mandate and overriding principle of Section 3553(a) requires a district court to impose a sentence "*sufficient, but not greater than necessary",* to comply with the four purposes of sentencing set forth in Section 3553:

(a)    retribution (to reflect seriousness of the offense, to promote respect for the law, and to provide "just punishment");

(b)    deterrence;

(c)    incapacitation ("to protect the public from further crimes"); and

(d)    rehabilitation ("to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner").

18 U.S.C. § 3553(a)(2).

The sufficient-but-not-greater-than-necessary requirement has been described as the "parsimony provision." *See, e.g., United States v. Brown,* 356F. Supp. 2d 470, (M.D. Pa. 2005); *see also Bifulco v. United States,* 47 U.S. 381, 387 (1980) (explaining that statutory construction "rule of lenity" applies to sentencing statues as well as to substantive criminal offense statues).

In determining, what sentence is sufficient but not greater than necessary to comply with the Section 3553(a)(2) purposes of sentencing, the court must consider the factors listed in Section 3553(a). These are (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) "the kinds of sentence available," (3) the guidelines and policy statements issued by the Sentencing Commission, including the (now non-mandatory) guideline range; (4) the need to avoid unwarranted sentencing disparity; and (5) the need to provide restitution were applicable. 18 U.S.C. § 3553(a)(1),(a)(3), (a)(5)-(7). Neither the statute itself, nor *Booker,* nor any other accepted authority suggests that any one of these factors is to be given greater weight than any other factor. However, it remains crystal clear that all of these factors are subservient to Section 3553(a)'s mandate. That is to say that any sentence imposed must not be greater than necessary to comply with the four purposes of sentencing.

Because of the initial ambiguity in the statute and opinion, the first two published district court sentencing opinions after *Booker* presented two very different views regarding how much

weight should be given to advisory guidelines. Judge Cassell of the District of Utah, only one day after *Booker* was decided, ruled that he will continue to give "considerable weight" or "heavy weight" to the sentencing guidelines, deviating from the applicable range only "in unusual cases for clearly identified and persuasive reasons." *United States v. Wilson,* 350 f. Supp. 2d 910, 912 (D. Utah 2005); *see also United States v. Wilson*, 355 F. Supp. 2d 1269, (D. Utah Feb. 2, 2005) (reaffirming position and responding to critics of first *Wilson* decision).

In a much better reasoned opinion, Judge Adelman of the Eastern District of Wisconsin disagreed, noting that *Wilson* is inconsistent with the remedial majority in *Booker,* which "direct[s] courts to consider all of the § 3553(a) factors, many of which the guidelines either reject or ignore." *United States v. Ranum,* 353 F. Supp. 2d 984, (E.D. Wis. Jan. 19, 2005). Judge Adelman reasoned that while courts must "seriously consider" the guidelines and give reasons for sentences outside the range, "in doing so courts should not follow the old 'departure' methodology." Judge Adelman further recognized that:

> [t]he guidelines are not binding, and courts need not justify a sentence outside of them by citing factors that take the case outside the "heartland." Rather, courts are free to disagree, in individual cases and in the exercise of discretion, with the actual range proposed by the guidelines, so long as that thee ultimate sentence is reasonable and carefully supported by reasons tied to the § 3553(a) factors.

Id., *see United States v. Myers,* 2005 WL 165314, at *1 (S.D. Iowa Jan. 26, 2005) (Pratt,J.) (agreeing with *Ranum* approach and arguing that the *Wilson* approach is in error because it makes the guidelines, "in effect, still mandatory"); *United States v. West,* 383 F. Supp. 2d 517 (S.D.N.Y. Jan. 27, 2005) (following *Ranum*); *see also United States v. Ameline,* 400 F.3d 646, (9th Cir. 2005) (stating that advisory guideline range is "only one of many factors that a sentencing judge must consider in determining an appropriate individualized sentence").

In *United States v. Hughes*, 396 F.3d 374 (4th Cir. 2005), the Fourth Circuit stated that, as to its review of a sentence for reasonableness, "the determination of reasonableness depends not

only on an evaluation of the actual sentence imposed, but also in the method employed in determining it." *Id.* At 381 n.8. The Fourth Circuit also observed that "the first step for sentencing courts is to determine the range prescribed by the guidelines after making such findings of fact as are necessary," and further, that "the district court must consider the *correct* guideline range before imposing a sentence." *Id. At 381.*

## The Advisory Guideline Range

While Yaghi does not intend by offering this advisory guidelines calculation to forfeit any of the objections made as to the various enhancements, both in regard to *Blakely* issues and non-*Blakely* issues, we provide the following calculations in order to assist the Court in determining a more accurate starting point for sentencing.

Initially, the relevant conduct outlined in the initial presentence report is lifted from the prosecutors' closing argument, but lacks factual relevance to sentencing. Much of the relevant conduct regurgitated is related to the actions of Daniel Boyd. Because we are familiar with the evidence presented at trial, and because of the factual outline provided above, it is not necessary to restate the facts here. However, it remains important to point out that Yaghi left Daniel Boyd's company in early 2007. Thus, the large volume of conduct included as relevant conduct thereafter is not material as to Yaghi.

A conspiracy charge may stand without the selection of specific victims. Herein, no evidence was introduced that Yaghi took any action whatsoever to target an actual person, victim or government. This is best described as an inchoate or incomplete offense. Additionally, there is no evidence that any target, victim or government was ever selected while Yaghi was in the company of Daniel Boyd. As acknowledged in paragraph 44 of the pre-sentence report, there "was no identifiable victim associated with this offense".

## Base Offense Level

We must first begin with a base offense level of 33.  U.S.S.G. § 2A1.5.

## Victim related Adjustment

Logic dictates that if there is no identifiable victim, paragraph 44, associated with this offense then there can be no enhancement or victim related adjustment.  U.S.S.G. § 3A1.1(a). The record is void of any evidence that Yaghi selected any victim or property because of the actual or perceived race, color, religion, national origin, ethnicity, gender disability or sexual orientation of any person.  Thus, the 3 points added at paragraph 71 must be deducted.  Likewise, the same logic and fact dictates that the 6 points added at paragraph 72 must be deducted.

## Terrorism Enhancement

Chapter three of the United States Sentencing Guidelines provides adjustments to a defendant's guideline range based on the intended victim of the underlying offense committed by a defendant.  Upon information and belief, the Government is seeking the adjustment for terrorism, found in U.S.S.G. § 3A1.4.  Application of the terrorism adjustment automatically adds twelve levels to Yaghi's base offense level or raises Yaghi's base offense level to at least 32 if the addition of twelve levels results in a base offense level of less than 32.  This enhancement has been added at paragraph 73.

 This same terrorism adjustment also mandates that a defendant who receives the terrorism adjustment will have a Criminal History category of VI, the highest possible under the guidelines, regardless of what the defendant's actual Criminal History is calculated under the guidelines.  Yaghi should have a criminal history of III.

The terrorism adjustment is referred to as an "override" because it substantially increases the normal base offense level for the crime of conviction and assigns the highest criminal history

category to the defendant, regardless of what the defendant's actual criminal history category is under the Guidelines. In most, if not all cases that apply the terrorism adjustment, a defendant's suggested guideline range equals a sentence of 360 months to life in prison. This override ensures that a defendant will receive the maximum punishment allowed under any statute that the defendant is convicted regardless of culpability. Yaghi has been subjected to the override and life sentence at paragraph 84. The application of this override is improper as to Yaghi.

There are two requirements that must be satisfied in order for the terrorism enhancement in U.S.S.G. §3A1.4. to be applicable in the determination of a federal sentence. The first requirement is that the offense of conviction for one or more offenses enumerated in 18 U.S.C. § 2332b(g)(5)(B)(i)-(iv). The list of statutes that qualify as predicate offenses for the terrorism enhancement are listed. Included in that list are the two offenses that Yaghi was charged with, 18 U.S.C. § 956(a) (conspiracy to murder, maim, kidnap, or otherwise injure persons abroad) and 18 U.S.C. § 2339A (conspiracy to provide material support to terrorists). The second requirement is that the offense is "*calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.*" 18 U.S.C. § 2332b(g)(5)(A). The second requirement is lacking in Yaghi's case.

Courts have interpreted this language to mean essentially that the defendant committed the offense with the specific intent to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. *See United States v. Chandia*, 395 Fed.Appx. 53 (4th Cir. 2010); *United States v. Stewart*, 590 F.3d 93, 137-39 (2d Cir.2009); *United States v. Hammoud*, 381 F.3d 316, 356 (4th Cir.2004); *United States v. Benkahla*, 530 F.3d 300, 313 (4th Cir.2008). In other words, a defendant has to be convicted of one of the enumerated felonies that qualify for the terrorist enhancement, and *have committed the*

crime *specifically intending that the consequence flowing from the commission of the crime would result in the United States Government, or some other government, being victimized or weakened in some way*. This element of the enhancement has not been proven at trial or provided in discovery. Again, speculation or bald assertions that this enhancement applies is not sufficient.

The Fourth Circuit has been very diligent in ensuring that the government meets its burden with regard to this draconian enhancement. The government, not Yaghi, must show that the sentence increased by applying the terrorism enhancement.

There have been several cases that have dealt with issues surrounding the application of the terrorism enhancement, including several cases in the Fourth Circuit. There have been cases where a defendant has been convicted for violating 18 U.S.C. § 2339A and the court did not apply the terrorism enhancement. See, e.g. *United States v. Khan*, 461 F.3d 477 (4th Cir. 2006); *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009).

*United States v. Chandia* provides a good illustration of the necessary factual showing regarding the intent element and the necessary factual showing that must be made to satisfy the requirement to the terrorism enhancement. *Chandia* is a Fourth Circuit case. The Fourth Circuit issued two appellate opinions in the *Chandia* case. One opinion was issued after the initial appeal and the second after the remand and resentencing of *Chandia*. The facts in the *Chandia* case bear some similarity to the facts in Yaghi's case.

The case arose out of the government's investigation into an alleged terrorist support network based in the suburbs of Washington, D.C. Much of the investigation involved individuals associated with the Dar al Arqam Islamic Center in Falls Church, Virginia. There a man named Al Timimi who was a lecturer and vocal supporter of violent jihad against the

enemies of Islam. Chandia, the defendant in the case, is a Pakistani national who lived in Germantown, Maryland, and regularly attended Dar al Arqam. In a four-count indictment, Chandia was charged with conspiracy to provide material support to terrorists and a substantive count of providing material support to terrorists, both under 18 U.S.C. § 2339A, and conspiracy to provide material support to a foreign terrorist organization and a substantive count of providing material support to a foreign terrorist organization, both under 18 U.S.C. § 2339B.

The government's indictment was based on the following information. In a search of Chandia's vehicle, the government found a CD with material that appeared to celebrate the tragedy that occurred on September II, 2001. Chandia played paintball on a number of occasions, the purpose of which the government alleged, was to train for violent jihad. Chandia also traveled to Pakistan during the relevant time alleged in the indictment. The government contended that Chandia traveled for the purpose of attending terrorist training camps (although the government was unable to produce any evidence in support of its contention).

Chandia argued his purpose for the trip was to visit his family and help prepare for his brother's upcoming wedding, and also to care for his elderly father who had fallen ill and had undergone a thyroid operation. Additionally, Chandia picked up Mohammad Ajmal Khan, a known terrorist to the U.S. Government, from the airport and let Khan use his computer at his apartment to send a couple of emails. The defense acknowledged Chandia's relationship with Khan, but claimed that Chandia was unaware of Khan's involvement with a terrorist organization.

At trial, Chandia was convicted of both the conspiracy and the substantive charge in violation of 18 U.S.C. 2339B and the conspiracy in violation of 18 U.S.C. § 2339A. He was acquitted of the substantive charge of providing material support to terrorists in violation of 18

U.S.C. § 2339A.  At sentencing the government sought the terrorist enhancement under U.S.S.G. §3A1.4.  Chandia had no criminal history, and his base level guidelines range under the applicable guideline, without the terrorism enhancement, was 63-78 months of imprisonment. However, after factoring in the terrorist enhancement, Chandia's guideline range increased astronomically to 360 months to life.

Chandia argued that the terrorism enhancement should not apply in his case and challenged many of the factual assertions contained in the Presentence Report (PSR), however, the district court did not resolve the factual disputes.  The court did not expressly state that the terrorism enhancement was being applied in the determination of Chandia's sentence, but in its oral disposition, the district court concluded that the proper guideline range for Chandia was 360 months to life.  Ultimately the court sentenced Chandia to 180 months in prison, which is equivalent to the statutory maximum for a single conviction of providing material support.

On appeal to the Fourth Circuit Court of Appeals, Chandia challenged, among other issues, the application of the terrorist enhancement in determining his sentence.  The court began its discussion regarding Chandia's challenge to the application of the terrorist enhancement by explaining what must be established by the government in order for the enhancement to apply. The court stated:

> Application of the terrorism enhancement provides a twelve level enhancement—and an automatic criminal history category of VI—when the "offense is a felony that involved, or was intended to promote, a federal crime of terrorism." The key term, "a federal crime of terrorism," is defined to consist of two elements: (1) the commission of one of a list of specified felonies, which includes each of the material support offenses at issue in this case, and (2) a specific intent requirement, namely, that the underlying felony was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

(internal citations omitted).  The court went on in its opinion to make it clear that there must be factual assertions to support the application of the terrorism enhancement and furthermore a

conviction for one or more of the enumerated offenses that are subject to the terrorist enhancement standing alone does not automatically warrant its application.

The court distinguished *Chandia* from other cases where the terrorist enhancement has been applied when the intent element could be safely inferred from the basic facts underlying the defendant's conviction that often would consist of violent acts clearly directed towards furthering a terrorist cause. In *Chandia*, the Fourth Circuit noted the district court was relying on the basic facts underlying the case as grounds to apply the terrorism enhancement as it had done in previous cases. However, the basic facts underlying Chandia's conviction alone, were not sufficient to justify the application of the enhancement. The Fourth Circuit concluded that because there was no factual finding on the intent element that must be satisfied in order for the terrorism enhancement to apply, and because the basic facts supporting the conviction do not give rise to an automatic inference of the required intent, that Chandia's sentence would be vacated and his case remanded to the district court for resentencing.

The Fourth Circuit instructed the district court at resentencing to resolve any factual disputes that were not addressed in the first sentencing and further directed the district court to identify the evidence in the record supporting its determination if the necessary factual findings are made in the resentencing.

At resentencing, the district court once again found that the application of terrorism enhancement in calculating Chandia's guideline range was proper. After his resentencing, Chandia, again appealed his case to the Fourth Circuit. The Fourth Circuit began its opinion in Chandia's second appeal by briefly commenting on the intent element and the terrorism enhancement in §3A1.4 of the U.S. Sentencing Guidelines.

> Although it may seem at first blush that a terrorism-related conviction like Chandia's is naturally a "federal crime of terrorism," Congress chose a more narrow, motivation-based

definition. A "federal crime of terrorism" is a violation of one of many statutorily enumerated offenses and is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5). The "calculated to influence or affect" element of the definition imposes a specific intent requirement that a sentencing court must find before applying the enhancement. Chandia, 514 F.3d at 376; United States v. Stewart, 590 F.3d 93, 137-39 (2d Cir.2009).

*United States v. Chandia,* 395 Fed.Appx. 53 (4th Cir. 2010).

The court of appeals stated in its opinion that the district court did not follow the instructions given by the court when Chandia's sentence was vacated and his case was remanded for resentencing. The district court again made no factual findings, did not address any of defense counsel's objections to the PSR, and did not point to any evidence in the record that supported its determination that the application of the terrorism enhancement was warranted. The court of appeals reiterated the necessity to make a factual showing of the existence of the necessary specific intent in order for the terrorism enhancement to be properly applied. The court vacated the sentence and remanded the case back to the district court for resentencing.

*Chandia* is a clear example of the government failing to show evidence sufficient to support the intent element of the terrorism enhancement that was sought in sentencing. Furthermore, as in the *Chandia* case, in Yaghi's case, there is no evidence of the second factual prong of the enhancement. See, e.g., *United States v. Mandhai*, 375 F.3d 1243 (11th Cir.2004) (conspiracy to force changes in government policy by blowing up public utility structures).

The Fourth Circuit has provided guidance in several other cases regarding the application of the terrorism enhancement and the evidentiary showing that is necessary to support application. See *United States v. Hammoud*, 381 F.3d 316, 356 (4th Cir.2004)(upholding district court's application of § 3A1.4 terrorism enhancement where defendant had "close connections with Hizballah officials" and his own testimony indicated that he was "well aware of Hizballah's terrorist activities and goals and that he personally supported this aspect of Hizballah" (emphases

added)), vacated on other grounds, 543 U.S. 1097, 125 S.Ct. 1051, 160 L.Ed.2d 997 (2005);

*United States v. Benkahla*, 530 F.3d 300, 313 (4th Cir.2008) (holding that enhancement was proper because defendant "attended a jihadist training camp abroad, was acquainted with a network of people involved in violent jihad and terrorism, and lied about both"; distinguishing *Chandia* on the ground that the district court made "extensive factual findings" and appropriately applied the enhancement to serve its purpose of punishing defendants "more harshly" when their "wrongs served an end more terrible than other crimes").

Yaghi's involvement in this case does not rise to the level that justifies the application of the terrorist enhancement. The evidence and time of disassociation as it relates to Yaghi dictates that no factual finding with regard to the second prong can be supported.

Because of the failure of the government to produce any evidence with regard to the second prong of the enhancement, the 12 points included in the draft must be deducted.

### Minimal Role in the Offense

Yaghi should receive a reduction in his offense level based on §3B1.2(a) because even though he was convicted of both Counts One and Two, he was a minimal participant in the offense. Based on Application Note 3(0(4) to §3B1.2(a), the adjustment for minimal participant reduction is:

> [I]ntended to cover defendants who are plainly among the least culpable of those involved in the conduct of the group. Under this provision, the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant.

Based on the above summary of the testimony and evidence presented at trial, Yaghi is clearly the least, or one of the least, culpable of any of the co-defendants in this case. Yaghi did not know some of the co-defendants in his case and had absolutely no material contact with Daniel Boyd after his trip in early 2007. Daniel Boyd was the ringleader of the conspiracy.

## **Adjustment for Role in the Offense**

The base offense level of 33 should be reduced 4 points as a result of the application of §3B1.2(a)

## **Adjusted Offense Level**

The adjusted offense level should be a level 29.

## **Guideline Range**

The guideline range, for both counts, should be reduced to 108 to 135 months. Paragraphs 82 and 84.

## **GROUNDS FOR DOWNWARD DEPARTUREAND VARIANCE**

The court should depart to a lower offense level on the following bases, whether taken individually or in combination.

Application note 18(C) of Section 2B1.1 provides, "There may be cases in which the offense level determined under this guideline substantially overstates the serious of the offense. In such cases, a downward departure may be warranted." U.S.S.G. § 2B1.1, comment. (n. 18(C)). Yaghi's is such a case for many reasons. Yaghi was a young 19 year old boy when he was targeted by Daniel Boyd. He was fatherless, young and impressionable. He had no paternal support or leadership and was taken with Boyd's stories of Afghanistan. Many in the community were taken with the stories and imposed upon Boyd a heroic persona. Additionally, many testified that the community at the IAR indoctrinated the youth in the ideals herein discussed. There was clearly an overreach by Boyd of the youth. The narcissism is palpable and approaches a pedophilic nature in the way and manner in which Boyd targeted Yaghi and other youth. Boyd bolstered his own persona at the direct expense of Yaghi and other youth. Boyd

bolstered his own persona at the direct expense of his family and children. He was and remains a nightmare.

Chapter 5 departures are also applicable. Coercion and duress are applicable pursuant to 5K2.12. Yaghi was targeted and coached by Boyd. The trial testimony established a pattern and practice of Boyd targeting youth. Yaghi was susceptible to this attack because he lacked paternal support.

Yaghi's behavior was an aberration pursuant to 5K2.20. Yaghi was targeted and prompted by Boyd. The character letters provided the court establish that Yaghi was a good boy and possessed good qualities. He was a good employee and remained trouble free until he met Boyd.

Yaghi is entitled to a variance from the guidelines. First, Yaghi was raised in an abusive environment and without paternal support. Second, the community fostered the radical ideology espoused by Boyds. Third, Boyd targeted Yaghi because of his familial issues and because of his youth. Fourth, Yaghi was a minor participant at best and departed Boyd's company in early 2007. Fifth, to sentence Yaghi to life would result in a disparity of sentences. The Boyd sons were sentenced to 96 and 108 months. The Boyd sons were much more culpable that Yaghi. Additionally, the Boyd sons were present through 2009 and Yaghi had departed the Boyds company in early 2007.

## Consideration of Aggravating Factors

As stated previously, Section 3553(a) requires a court to heed (among other factors) the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence to reflect the seriousness of the offense, promote respect for law, provide "just punishment," afford adequate deterrence, protect the public, and provide needed

educational or vocational training, medical care, "or other correctional treatment." 18 U.S.C. §§ 3553(a)(1), (2)(A)-(D). Courts must also consider "the need to avoid unwarranted sentence disparities amount defendants with similar records who have been found guilty of similar conduct." 18U.S.C. § 3553(a)(6).

In considering the history and characteristics of the defendant, the Sentencing Guidelines reflect most of the aggravating factors that courts commonly encounter. A tilt toward the aggravating factors appears in the predominance of upward adjustments over downward adjustments in specific offense characteristics listed in each offense guideline in Chapter Two of the Guidelines and Chapter Three adjustments. Factors that add points to the offense level far outnumber factors that subtract points. Yaghi's case illustrates the point with exceptional clarity. In calculating the offense level for the offenses, the probation officer added four enhancements to the base offense level to arrive at an adjusted offense level. In contrast, Yaghi received not a single downward adjustment. Yaghi clearly played a minor role in the offense. He left in 2007, years before arrest and Boyds' evolving conduct.

The emphasis on the aggravating continues in subchapter's 5H and 5K, which discourage or forbid more grounds for downward departure than they encourage. Subchapter 5H includes no recommended downward departures and only two departure considerations (criminal history, U.S.S.G. § 5H1.8, and dependence upon criminal activity for livelihood, § 5H1.9) that cut both ways. Subchapter 5K includes thirteen suggestions for upward departure (U.S.S.G. §§ 5K2.1-5K2.9, 5K2.14, 5K2.17, 5K2.18, 5K2.21), but only eight suggestions of downward departure (U.S.S.G. §§ 5K1.1, 5K2.10, 5K2.11, 5K2.12, 5K2.13, 5K2.16, 5K2.20 and 5K2.22).

The trend in the due process jurisprudence of sentencing, which is most apparent in capital cases, is to limit aggravating factors to those set out in statutes and to reject limits on

mitigating factors.  *See Pnry v. Lynaugh,* 492 U.S. 302, 327-28 (1989) ("the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense;" there, mental retardation and childhood abuse), *overruled on other grounds, Atkins v. Virginia,* 536 U.S. 304 (2002); *Buchanan v. Angelone,* 522 U.S. 269, 276 (1998) ("the sentencer may not be precluded form considering, and may not refuse to consider, any constitutionally relevant mitigating evidence"); *compare* 18 U.S.C. § 3592(a) (in a capital case, sentencing jury "shall consider any mitigating factor, including the following") (emphasis added) *with* § 3592(b) (same jury may consider only enumerated statutory aggravating factors).

The Sentencing Guidelines provide a helpful analog in non-capital cases.  They collect many statutory aggravating factors and a few mitigating factors.  Because of *Booker*, the courts may now appropriately look to individual cases and circumstances for any mitigating factors that apply.  Importantly, those include previously prohibited or discouraged departure considerations. *Koon v. United States*, 518 U.S. 81, 93-96 (1996) (that *Booker* now permits – if not requires – federal courts to weigh again).

 In the capital setting, forbidding consideration of possible mitigation violates due process.  *Buchanan v. Angelone*, 522 U.S. at 276.  Courts have no principled reason to apply a different due process rule to mitigation of federal sentences that do not involve a punishment of death.  Non-capital sentences extend to and include a passive death sentence of life without parole – which is presently the top of the guideline range in Yaghi's case.

Congress made consideration of the individual and his individual case a centerpiece of non-capital sentencing under the Sentencing Reform Act of 1984.  18 U.S.C. § 3553(a)(1) (a sentencing court shall consider "the nature and circumstances of the offense and the history and

characteristics of the defendant") Section 3551(a) provides that a sentence must achieve the purposes of § 3553(a)(2)(A) through (D) "to the extent that they are applicable in light of all the circumstances of the case".

A focus on both aggravating factors and all mitigating factors, fits more closely with the statutory command that the sentence in the end be "sufficient, but not greater than necessary" to achieve the goals of sentencing. Section 3553(a). Congress requires the lowest adequate sentence. The statute forbids sentence that is higher than necessary. In short, the statute favors mitigation of the sentence, although not depreciation of the crime.

### Consideration of Mitigating Factors

Even when no traditional departure is available or granted, a district court may still sentence outside the applicable guidelines range in exercising its discretion under Section 3553 – i.e., in imposing a statutory sentence – without the need to justify the sentence under a "departure' or "heartland' methodology. Put another way, even if this Court does not find that the standard downward departures requested above are appropriate to consider in determining the advisory guideline range in the first instance, the Court should consider additional grounds and supporting facts in determining a statutory sentence.

This is because by statutory requirement, "*no limitation* shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661 (emphasis added). This statutory language overrides the (now-advisory) policy statements in Part H of the Guidelines, which list "not ordinarily relevant' to sentencing a variety of factors, including a defendant's family ties and responsibilities, and his charitable service. *See Stinson v. United States*, 508 U.S. 36, 44 (1993) (noting in context of

analogy between Sentencing Guidelines and administrative law that 'if a statute is unambiguous, the statute governs'"); U.S.S.G. §§ 5H1.11.

The Court must therefore still consider the facts giving rise to the departure grounds or variance in determining what sentence is sufficient but not greater than necessary to meet the purposes of sentencing. Accordingly, Yaghi incorporates into this section the arguments made above for downward departure or variance to a lower advisory guideline range.

### Recommendation for Statutory Sentence

As previously explained, after determining the final advisory range, the court must then consider that range as one of the many factors laid out in Section 3553(a). While the Court must consider all of the facts, it should consider the following in particular. First, the Court must consider the nature and circumstances of the offense. 18 U.S.C. § 3553(a)(1). Yaghi's conduct does not represent the typical terrorism offense. He did not kill or maim any person or physically do harm to any entity or Country.

The offense is also atypical in that, as previously argued, there was very little evidence presented at trial that Yaghi personally purchased significant firearms practiced military tactics, entered war zone(s) or otherwise played any significant part or role in the purported conspiracy.

The Court must consider the history and characteristics of the Defendant. 18 U.S.C. § 3553(a)(1). Yaghi incorporates here the arguments made above for a downward departure or variance.

The Court must consider the need to prevent unwarranted disparity among defendants who have committed similar offenses. 18 U.S.C. § 3553(a)(6). If the Court applies the advisory guideline range, Yaghi will be sentenced to a life sentence. To sentence Yaghi to a sentence of 360 months or higher clearly would not satisfy the need to prevent unwarranted sentence

disparity.  Nor would it promote respect for the law.  18 U.S.C. § 3553(a)(2)(A).  It would be inconsistent with the sentencing of the Boyd brothers.  The Boyd brothers received sentences of 96 and 108 months.  How can this Court sentence Yaghi to life when these individuals receive a sentence of ten (10) years or less?  This seems inconsistent with the exercise of one's right to a jury trial.  Clearly the Boyd brothers were neck deep in the activities between 2007 and 2009.  A time period when Yaghi had ceased all contact with the Boyds?  To sentence Yaghi to a life sentence in light of the exercise of his constitutional right to a jury trial could appear to completely ignore his individual culpability.  Yaghi's individual culpability is the most important factor when issuing a sentence that is not greater than necessary to achieve the proper goals of sentencing.

## **CONCLUSION**

In light of the statutory factors and arguments above, Yaghi asserts that a sentence which well below the advisory guideline range is appropriate in that it is sufficient, but not greater than necessary, to fulfill the purposes of sentencing under the Sentencing Reform Act.  We must remind ourselves that we need not cater to the legislature's or executive's desire for statistical gratification and political expediency, for we are dealing with the dispensation of individual justice.  A worthy goal removed from the need for political reflection.

Respectfully submitted,

This the 3rd day of January, 2012.

/s/James M. Ayers II
Attorney for Defendant Ziyad Yaghi
Ayers & Haidt, P.A.
307 Metcalf Street
Post Office Box 1544
New Bern, North Carolina 28563
Telephone: (252) 638-2955
Facsimile: (252) 638-3293
Jimayers2@embarqmail.com
State Bar No. 18085
Criminal – Appointed

## CERTIFICATE OF SERVICE

This is to certify that the undersigned has personally served a copy of the forgoing Sentencing Memorandum and Statement of Facts, according to the applicable Civil Procedure Rules of this Court, to wit:

__X__ CM/ECF (U.S. District Courts; U.S. Courts of Appeal)

Date: January 3, 2012

/s/James M. Ayers II
Attorney for Defendant Ziyad Yaghi
Ayers & Haidt, P.A.
307 Metcalf Street
Post Office Box 1544
New Bern, North Carolina 28563
Telephone: (252) 638-2955
Facsimile: (252) 638-3293
jimayers2@embarqmail.com
State Bar No. 18085
Criminal - Appointed

TO: John Bowler
U.S. Attorney's Office
310 New Bern Ave.
Suite 800
Raleigh, NC 27601-1461
john.s.bowler@usdoj.gov

Jason Harris Cowley
U.S. Attorney's Office
310 New Bern Avenue
Suite 800
Raleigh, NC 27601-27601
jason.cowley@usdoj.gov

R. Daniel Boyce
Nexsen Pruet, PLLC
4141 Parklake Avenue, Suite 200
Raleigh, NC 27612
dboyce@nexsenpruet.com

Rosemary Godwin
Federal Public Defender
150 Fayetteville St. Mall
Suite 450
Raleigh, NC 27601-2919
rosemary_godwin@fd.org

Debra C. Graves
Federal Public Defender
150 Fayetteville St. Mall
Suite 450
Raleigh, NC 27601-8005
debra_graves@fd.org

Myron T. Hill, Jr.
Browning & Hill
200 E. Fourth Street
Greenville, NC 27835
mhill@browning-hill.com

Jason M. Kellhofer
US Department of Justice
950 Pennsylvania Avenue NW
Room 2720
Washington, DC  20530
jason.kellhofer@usdoj.gov

Barbara D. Kocher
U.S. Attorney's Office
310 New Bern Aveue
Suite 800
Raleigh, NC  27601
barb.kocher@usdoj.gov

Robert J. McAfee
McAfee Law, P.A.
P.O. Box 905
New Bern, NC 28563
rjm@mcafee-law.com

Paul K Sun, Jr.
Ellis & Winters
PO Box 33550
Raleigh, NC  27636-3550
Paul.Sun@elliswinters.com

Joseph E. Zeszotarski, Jr
Poyner & Spruill
P.O. Box 10096
Raleigh, NC  27605
jeszotarski@poynerspruill.com